*In re* JEREMY LEE PIPER, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellant, *v.* SONJA S. PIPER, Respondent-Appellee.)

Fourth District   No. 14784

Opinion filed October 24, 1978.

Ronald C. Dozier, State's Attorney, of Bloomington, for the People.

Craig H. Greenwood, of Bloomington, for appellee.

W. Charles Witte, of Bloomington, guardian ad litem for Jeremy Lee Piper.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

The State timely appeals a trial court decision finding Jeremy Lee Piper not to be a neglected minor and the court's dismissal of the State's petition for an adjudication of wardship. At issue is whether the trial court considered an improper factor in determining the minor not to be neglected and whether the trial court's decision was against the manifest weight of the evidence. Because of the manifest weight issue, some detailing of the evidence presented is necessary.

The allegedly neglecting mother is Sonja S. Piper, and Sonja's mother is Mildred Chambers. The first incident occurred on July 12, 1977, at Chambers' mobile home.

While supper was being eaten, Sonja put Jeremy on the floor next to the dinner table. Mildred Chambers walked by and bumped into Jeremy; the minor ended up on his back between a child's chair and a flower pot. He started crying. The authorities were called when Jeremy became limp. Officer Pat O'Grady responded to the call and was told by Sonja that Chambers had bumped Jeremy in the living room in front of the couch and the child hit his head on the floor. The dining room table and chairs were at the opposite end of the mobile home from the living room couch. Sonja told Officer Lehmann that the child was placed on the floor in the dining area and had hit his head on the child's chair after being bumped. Carlene Roberts, a Department of Children and Family Services employee, testified that Sonja told her the child's head hit the floor, and, the next day, said Jeremy's head must have hit the child's chair.

Dr. Richard N. Lee had treated the child since his birth on December 20, 1976. When he saw Jeremy on July 12, 1977, the child had no wounds or cuts but had a swelling on the head. Sonja told Dr. Lee the child was sitting in the sink and fell to the floor. The child had a linear skull fracture, but no other injuries. Jeremy was transferred that night, and Dr. Richard H. Lee examined Jeremy. The doctor found no evidence of external trauma. Jeremy's general physical condition was good and he was awake and playful. While there were no marks on the child, there was evidence of some bleeding inside the eyes, a side effect of the blow which caused the linear fracture. Sonja told the doctor her son had slipped in the sink while she gave him a bath and hit his head. Later that day, she continued, Jeremy had been set on the floor and bumped, causing him to once more hit his head. The doctor found the mother's explanation unlikely since he thought an impact of greater magnitude was needed to create a linear skull fracture in the pliable bones of a 6-month-old child. On cross-examination, the doctor stated Jeremy was a healthy, well-nourished, normal-appearing infant. The doctor did not believe brain damage

occurred, was not suspicious the mother was hiding something from him, and did not believe Jeremy had been abused.

After the child was released, Sonja admitted she laid Jeremy on a top bunk for a moment (the bottom bunk was occupied), but that she put blankets all around the minor and after getting a glass of water came right back to lay down with Jeremy. On July 19, she gave Jeremy some blocks to play with and put him on a couch. She placed pillows next to Jeremy and told Joe Wright to watch the minor while she went out to speak with her sister. Wright testified he was lying down and, after giving the minor some toys, went to the front door when he heard his name mentioned; when he looked around, he saw Jeremy on the floor "because you know, kids fall." Sonja told Officer Lehmann that Wright had been told to watch Jeremy and, after the minor was hurt, Wright didn't at first care to explain if the child had fallen. She told both Lehmann and Officer Steve Krueger that Wright didn't like the child.

Jeremy saw both doctors after the July 19 fall. Dr. Richard N. Lee suspected abuse due to two head injuries within the space of one week; the hospital called the Department of Children and Family Services. Dr. Richard H. Lee examined Jeremy and found no fracture from the second fall. Although the minor's brain waves were abnormal on that date, due to a concussion, they tested normal on September 6, 1977.

Carlene Roberts thought Jeremy was possibly abused because the story of how the injury occurred and the seriousness of the injury just "didn't add up." Roberts felt the child was neglected because a "safe, secure environment" was not being provided. She listed the factors leading to the conclusion being that (1) Sonja had been living in several places since the child had been born, (2) the minor's injuries, and (3) Sonja was living with a man she was not married to, with the additional caveat that he, Joe Wright, was considered by Roberts to be a person of mean temperament. Roberts admitted the child was not malnourished and also admitted part of her original suspicion that child abuse had occurred came from a report which mistakenly indicated that the child had suffered multiple skull fractures. She had never observed Sonja to be hostile to the child but found indications that Sonja had been abused as a child, which made it more likely that she would do the same to Jeremy.

Sonja felt herself to be a fit parent. Under questioning by the court, she conceded there might have been times when she wasn't watching Jeremy as close as she should have, but she usually kept him in a safe place.

The trial court determined the minor was not neglected and dismissed the petition.

■■ The State first argues that the trial court, in his oral ruling, committed error in considering whether or not removal from the parent was necessary in determining the minor was not neglected. The State admits

the court's language was ambiguous. We have carefully reviewed the court's comments and find that the trial court did not base its decision upon improper factors.

The State acknowledges its heavy burden of overturning the trial court's decision on a manifest weight theory, but argues the combination of the minor's tender age, the short time between the incidents, and the mother's unsatisfactory explanation thereof show that a finding of neglect should have been entered.

■■ Recently, our Illinois Supreme Court stated the determination of neglect in a juvenile court petition for wardship is not an easy task; neglect would be the failure to exercise the care that the circumstances justly demand and embraces wilful as well as unintentional disregard of duty. The court continued that neglect is not a term of fixed and measured meaning and the trial court must have broad discretion to reach a just determination. In further acknowledging the delicacy and difficulty of child-custody and child-neglect cases, the court stated these factors justify the deference which must be given to the trial court's use of its discretion and that the trial court decision should not be overturned unless it is palpably against the manifest weight of the evidence. (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820.) The essential policy consideration in a child-neglect case is the best interest and welfare of the child. The supreme court determined that the trial court's decision was correct in *Stilley* since there was no evidence the court failed to consider the child's welfare as its "primary consideration."

Here, it is clear the best interests and welfare of the minor were the trial court's primary consideration. The severity of an injury, standing alone, does not give rise to an irrebuttable presumption of parental neglect. The trial court's decision was not against the manifest weight of the evidence. *Stilley*.

Affirmed.

GREEN, P. J., and TRAPP, J., concur.